# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2025-NMSC-002**

**Filing Date: October 17, 2024**

**No. S-1-SC-38922**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

      Petitioner-Respondent,

v.

**HEATHER S.,**

      Respondent-Petitioner,

and

**JIMMY A. and WESLEY S.,**

      Respondents,

**IN THE MATTER OF NOAH S.,**

      Child.

**ORIGINAL PROCEEDING ON CERTIORARI**
**William E. Parnall, District Judge**

Children, Youth & Families Department
Mary A. McQueeney, Chief Children's Court Attorney
Kelly P. O'Neill, Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Petitioner-Respondent

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Respondent-Petitioner

Nanette E. Erdman
Rio Rancho, NM

for Guardian ad Litem

**OPINION**

**VARGAS, Justice.**

**{1}**     This case requires that we consider the evidence necessary to support a finding of neglect under NMSA 1978, Section 32A-4-2(G)(2) (2018), whether the district court may aggregate that evidence to determine whether the Children, Youth and Families Department (CYFD) satisfied its burden to prove neglect by clear and convincing evidence, and whether CYFD met its burden here.

**{2}**     For the reasons that follow, we conclude that the district court may aggregate evidence to determine whether CYFD has proven by clear and convincing evidence that a child is neglected. Under this standard, we hold that substantial evidence of a clear and convincing nature did not support the district court's adjudication of Child as a neglected child as a matter of law. *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 14, 120 N.M. 463, 902 P.2d 1066 (considering the cumulative effect of evidence to support a finding of abuse and neglect). Accordingly, we reverse both the Court of Appeals and the district court and remand to the district court for further proceedings consistent with this opinion.

**I.     BACKGROUND**

**A.     Factual Background**

**{3}**     CYFD initiated this proceeding by filing an abuse and neglect petition in district court against Heather S. (Mother) alleging, in relevant part, that her son (Child) was abused and neglected because: (1) Mother caused Child to be medically neglected, (2) Mother had unresolved domestic violence issues, (3) Mother allowed Child to live in substandard and hazardous housing, and (4) Mother educationally neglected Child. In support of its petition, CYFD provided the affidavit of its investigator, and presented testimony at the adjudication hearings from two CYFD investigators, Child's kindergarten teacher, and Child's principal. Mother also testified. The parties presented the following evidence.

**1.     September 2018 incident**

**{4}**     Prior to commencement of the present action, a CYFD investigator responded to an incident at Mother's home in September 2018 following a domestic dispute between Mother and a man called Jimmy, an individual who sometimes stayed with Mother and with whom Mother shared a daughter. Mother told the investigator that Jimmy had choked and hit her. When the CYFD investigator arrived at Mother's home, Jimmy was gone, and Mother was there with her two daughters. Mother told the CYFD investigator

that she also had a son, Child, who was living at the Children's Treatment Center (CTC) where he was receiving treatment for his severe Attention Deficit Hyperactivity Disorder (ADHD).

**{5}**     The CYFD investigator described Mother's home during this visit as "a little messy," but expressed no safety concerns with the condition of Mother's home. The CYFD investigator testified that there were cars and car parts in the front yard, but not a lot, and that the backyard was "not really messed up at all." And she acknowledged that she never asked Mother if the children play in either the front or back yards.

**{6}**     Rather, the CYFD investigator explained that CYFD's safety concerns at the time were "[j]ust the domestic violence with [Jimmy] and [Mother.]" Regarding the domestic violence, the investigator testified that she told Mother,

> [I]t would probably be a good idea to get a restraining order if she was going to get a restraining order. Pretty much, I knew that it had not been the first time that had happened, and I know she had had domestic violence in the past with other people. So I explained to her that it is a good idea to protect her kids.

Following the September 2018 incident, CYFD did not put a safety plan in place, nor did CYFD offer assistance to Mother or require any action on her part. *See* 8.10.3.7(XX) NMAC (explaining that a "'safety plan' is a detailed strategy that outlines immediate action steps the family and their network will take to help keep the child safe from the identified danger indicators").

**{7}**     Without testifying about any other instances, the CYFD investigator testified that she was concerned because Mother and Jimmy had a history of domestic violence and if Jimmy was still living there, there could be another incident. Mother denied that he lived at her home. The investigator explained she was concerned with Jimmy coming and going because they had been unable to reach him to assess the risk he posed.

## 2.     November 2018 incident

**{8}**     CYFD next contacted Mother in the early morning hours of November 29, 2018, after a police officer, who was there to arrest the children's two babysitters on outstanding warrants,[1] requested a safety inspection of the home to determine if removal of the children was necessary. Mother, who had been at the casino with Jimmy when CYFD was called, was at a neighbor's house when the CYFD investigator arrived. The CYFD investigator inspected the home and testified that, "in the kitchen, there was an electrical socket that had no plate or covering so the wires were exposed"; there was a sharp steak knife on the kitchen table "where the kids had access to it"; there were piles of clothes in the doorway, hallway, and in the childrens' bedrooms; there were also

---

[1]The record is unclear as to the reason for the warrants and only reflects that Mother left Child with two babysitters who were her friends. Indeed, CYFD acknowledges the record does not indicate the reason for the arrests.

piles of trash and debris in every room, "making it very hard to walk." There were "multiple roaches in the home scurrying around" in several rooms of the house, as well as dirty dishes and old food in the kitchen sink and the kitchen floor was "greatly discolored and sticky." The CYFD investigator also testified that the bathroom was dirty, with empty boxes and a discolored floor, the tub was dirty, "spotted black," and there was a "noticeable but faint smell of urine" throughout the entire house.

{9}     After inspecting the home, the CYFD investigator informed Mother, who was visibly upset and crying, that CYFD was called by law enforcement due to the condition of the home. She explained that CYFD had safety concerns with the exposed electrical socket, the steak knife on the table, and the clutter inside and outside of the house, which could make it difficult for the family to exit quickly in an emergency. The CYFD investigator told Mother that she needed to clean up the yard and create a safe path, and Mother said she would work on it. Mother also agreed to clean the inside of the home, and informed the CYFD investigator that she had been trying but was having a difficult time getting rid of the roaches.

{10}    The CYFD investigator then woke up the children, who had been asleep, and observed that Child was free from any injury. Child wore pajamas that were slightly dirty, with spots on them, however, none of the children were described as malnourished. Nevertheless, based on the investigator's safety concerns with the condition of the home, CYFD took the children into custody and Child was later placed in foster care.

{11}    Another CYFD investigator testified that when the children were brought into CYFD's receiving center later that day, they "had a smell to them," were "kind of dirty," and their shoes were "tattered and their clothes were dirty." However, the children had coats and were dressed appropriately for the weather. Regarding Mother, the investigator testified that Mother did not indicate whether she had gotten a restraining order since they last spoke in September, but acknowledged that she was not sure if Mother had been given any information, by either CYFD or law enforcement, on how to obtain a restraining order. Mother admitted to the CYFD investigator that she needed to clean and that the steak knife should not have been left on the table, but said it was up to Jimmy to clean the outside of the home because the cars and car parts were his.

{12}    CYFD returned to Mother's home the next day, November 30, 2018, to inspect Mother's progress on remediating CYFD's concerns about the condition of the home. At this inspection, the CYFD investigator observed stained carpets and "a lot of stuff everywhere," including a tire rim and "a big container full of just like car parts" in one of the children's rooms. The CYFD investigator testified that "[t]he kitchen was still kind of a disaster, dishes everywhere." CYFD was concerned that, because the children were small and there was no pathway to the front of the house, that they could trip and hurt themselves on the clutter, and because the car parts were "metal they could hurt themselves on that."

{13}    However, upon returning to Mother's home on that same day, November 30, 2018, the CYFD investigator did not see any cockroaches in the home, Child's room

was "pretty clean" except for the tire rim, and "the living room was pretty clean too." Notwithstanding these improved conditions, Child was not returned to Mother "mostly because the condition of the home had not changed," and CYFD did not believe the Child would be safe going home with Mother.

### 3. Child's medical care and behavioral issues

**{14}** CYFD held a Family Centered Meeting (FCM) on November 30, 2018, the day after the children were removed, to meet with Mother, explain why the children were in custody, and come up with a plan so that the children could be returned to Mother. CYFD expressed its concern about Child's medication and behavior at school. The CYFD investigator testified that, as far as she knew, Mother did not fill Child's prescription right away after he left CTC, and Mother told her she had issues getting his medication because of the "manufacturer or something." Mother also informed Child's principal she had had some difficulty filling Child's prescription. While Child's principal testified, "it was obvious" to her that Child was not on his medication and Mother acknowledged that there was a one-to-two-day lapse in Child's medication due to a preauthorization period required by her insurance, there was no evidence that Child had not been on his medication otherwise. Indeed, Mother provided Child's medication to the CYFD investigator the day of the FCM.

**{15}** CYFD also expressed concern with what it had learned about Child's behavior at school. The record reflects that Child's behavior would on occasion escalate to a point where his classroom had to be evacuated. In September 2018, Child's behavior was described by his teacher as "very disruptive to the learning environment. It had a pretty wide range of intensity from crying and refusing to do work to where the classroom had to be evacuated because he was tipping over the tables and throwing the chairs." The evacuations were necessary to prevent Child from harming himself or others by kicking, biting, or throwing objects in the classroom. Child's teacher stated his behavior was violent and his demeanor was frustrated and aggressive during these outbursts.

**{16}** While it is unclear in the record when and how many of these outbursts occurred, Child's teacher ultimately concluded that all the incidents occurred while Child was in Mother's care. The record indicates that Mother promptly came to the school when called to address these incidents, expressed concern with Child's behavior, and explained she believed his medication was affecting his behavior. During at least one of the incidents at school when Child was living with Mother, he was able to self-soothe after an outburst event requiring much less assistance from his teacher.

**{17}** Mother explained to the district court that she first noticed Child's behavior issues at age one and addressed them at that time by taking him to his pediatrician, who referred Child to PB & J Services, and PB & J Services referred Child to Behavior Management Services (BMS). BMS provided Child with twenty hours a week of service while he was at school, but then referred him to CTC for the first time after identifying he needed greater services. Mother initiated all of Child's treatments and services. Mother testified that Child was placed in CTC's residential treatment program twice, and the second time was from March 2018 until September 28, 2018. It was during his second

stay at CTC that Child was prescribed methylphenidate, a medication commonly known by the brand name Ritalin for ADHD. She testified that CTC provided her with a one-month supply of Ritalin following Child's discharge on September 28, 2018.

{18}     Mother testified that her routine for Child was to wake him up between 6:45 a.m. and 7:15 a.m., get him dressed, and feed him breakfast before giving him his medication. Mother explained she would feed Child prior to giving him his medication because it could cause decreased appetite. Mother testified that after refilling the prescription she noticed a change in Child's behavior. Mother also noticed a change in Child's behavior after his discharge from CTC, explaining that, "[Child] has always had a very hard time with change and transitions. So he went from an adjustment from having a very strict, very structured daily routine to having to share his time with his sisters and getting back in the home routine." To address these issues, Mother attempted to arrange wraparound services, but was not able to do so until CTC fully discharged Child, at which point he was put on a waitlist. In the meantime, Mother actively sought treatment for Child, arranging for play therapy treatment, and reaching out to CTC to schedule outpatient therapy.

### 4.     School attendance

{19}     CYFD was also concerned that Child had missed school but knew that Mother had transportation issues. Child had been absent twelve times and tardy fifteen times, during the first 60-day trimester. Some of the tardies were excused but none of the absences were. Three absences and four tardies are attributable to CTC during this time. While Child's teacher testified Child was absent or tardy 72% of the time, he did not know how many absences or tardies occurred when Child was with Mother and could not explain how he came up with the percentage.[2] When Mother brought Child to school late, she signed him in and walked him to class as required.

{20}     At Child's parent-teacher conference held just before Thanksgiving 2018, Mother addressed Child's attendance issues explaining they lived out-of-district and had transportation issues, but explained she was trying to resolve the issue. While Child's principal testified that she did not observe an improvement in Child's attendance after this conference, there were only three school days[3] between the parent-teacher conference and when Child was removed from Mother's care. Nevertheless, the tardies and absences had a negative impact on Child's academics and his social-emotional development, which affected his ability to form relationships with his peers. CYFD acknowledged that Mother placed Child in therapy to address his behavior issues, but then stated Mother had no plan to address his behaviors, absences, and tardies from school.

---

2Child's teacher testified he got the percentage from Synergy, an attendance tracking software, but did not explain how this system attributed specific dates to Mother to come up with this percentage.
3*See* APS 2018-2019 calendars https://www.aps.edu/schools/documents/ documents/archived/traditional-calendar-2018-19/view (last visited Sept. 26, 2024); https://www.nctq.org/dmsView/abq (last visited Oct. 2, 2024).

## 5. District Court's decision

**{21}** At the conclusion of the two-day adjudication proceeding, the district court found that Child was a neglected child under Section 32A-4-2(G)(2). Even though the district court acknowledged that "mom did a good job . . . with a hard child to deal with," the district court concluded that "the cumulative evidence," including the "unresolved domestic violence issue" proved by "clear and convincing evidence . . . that [Child] was neglected to a certain degree." The district court found that Mother "failed to protect the children" because she did not obtain a restraining order against Jimmy, who "could have been violent at any time" and Mother "couldn't have protected the kids from him."

**{22}** The district court also found that "there was some educational neglect" because the "[t]welve absences and fifteen tardies in a semester is not acceptable and it did affect [Child]." Additionally, the district court found that "the condition of the home is more than dirty," including the metal car parts and "stuff in the childrens' bedroom" that could have been a tripping hazard. The district court indicated, "[Mother] was told she needed to clean it up, and a couple of months later it was worse." The district court noted the "conflict in the testimony about medication and behaviors and when [Child] was on meds and off meds," but, ultimately, the evidence showed that "that there is chaos at home and that it needs to be resolved." The district court entered a written order adjudicating Child as a neglected child under Section 32A-4-2(G)(2). Mother appealed to the Court of Appeals.

## 6. Court of Appeals decision

**{23}** Prior to issuing its memorandum opinion, the Court of Appeals ordered supplemental briefing from the parties on the legal standard for neglect under Section 32A-4-2(G)(2). Notwithstanding its order, the Court of Appeals majority declined to address the legal standard, concluding the issue was unpreserved, and even if it had been preserved, the standard needed no clarification. *State ex rel. CYFD v. Heather S.*, A-1-CA-38614, mem. op. ¶ 21 (N.M. Ct. App. July 6, 2021) (nonprecedential).[4] Ultimately, the Court of Appeals affirmed the district court, holding that it "need not make any specific determination with respect to each finding of neglect by the district

---

[4]We note that Judge Ives called for a clarified standard of what constitutes neglect under the Abuse and Neglect Act (ANA) in his dissent, reasoning that the language of the act is insufficient to make parents aware of what conduct is prohibited and insufficient to guide CYFD in its enforcement of the act. *Id.* ¶ 29. Judge Ives raised the concern that the statute fails to give parents fair warning of what conduct will constitute neglect and may be constitutionally infirm on vagueness grounds. *Id.* ¶ 38. However, Mother agrees that she did not challenge the constitutionality of Section 32A-4-2(G)(2), and she does not raise the issue before this Court. Because neither party has challenged the constitutionality of this statute, this Court need not engage in a void for vagueness analysis. *Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so." (internal quotation marks and citation omitted)). Notably, the Court of Appeals has held that the language of Section 32A-4-2(G)(2) is not void for vagueness. *State ex rel. CYFD v. Shawna C.*, 2005-NMCA-066, ¶ 39, 137 N.M. 687, 114 P.3d 367 (holding that the phrase "without proper parental care and control . . . because of the faults or habits of the child's parent," provides an adequate standard "to guide CYFD in its enforcement activities and do[es] not invite or encourage arbitrary enforcement." (internal quotation marks and citations omitted)).

court . . . [because] the combined effect of Mother's failures support[ed] the district court's finding of neglect by clear and convincing evidence." *Id.* ¶ 14 (citation omitted). The Court of Appeals reasoned that there was substantial evidence of a clear and convincing nature to support the decision of the district court based on the following: there was a reasonable inference that Mother was not giving Child his medication based on his behavior, *id.* ¶ 15; Mother "failed to demonstrate that Child's attendance issues resulted from circumstances beyond her control," *id.* ¶ 16; Mother was "warned" in September 2018 about CYFD's concern with the condition inside and outside of her home and the conditions were worse in November 2018, *id.* ¶ 17; and Mother did not obtain a restraining order against Jimmy, disregarding the advice of the CYFD investigator. *Id.* ¶ 18. Mother appealed this decision and this Court granted the petition.

## II.    DISCUSSION

### A.    Preservation

**{24}**    Mother asks this Court to apply statutory construction principles and clarify the legal standard for neglect in New Mexico under Section 32A-4-2(G)(2). CYFD contends that this question is not properly before this Court because Mother did not raise it below, and instead it was raised by the Court of Appeals. It is undisputed that this issue was not raised before the district court. However, "this Court's role is to engage in statutory construction and apply a judicial interpretation that fully illuminates the Legislature's intent in enacting the child abuse statute." *State v. Consaul*, 2014-NMSC-030, ¶ 31, 332 P.3d 850 (citation omitted).

**{25}**    Furthermore, "[a]lthough generally, 'propositions of law not raised in the trial court cannot be considered sua sponte by the appellate court,' we have previously done so to resolve 'questions of a general public nature affecting the interest of the state at large.'" *Id.* ¶ 27 (quoting *State v. Jade G.*, 2007-NMSC-010, ¶ 24, 141 N.M. 284, 154 P.3d 659). "We will also determine propositions not raised in the trial court where it is necessary to do so in order to protect the fundamental rights of the party." *Consaul*, 2014-NMSC-030, ¶ 27 (internal quotation marks and citation omitted).

**{26}**    Here, concluding that it was a matter of general public interest, the Court of Appeals raised questions about our neglect standard sua sponte and ordered supplemental briefing on the issue. *See Heather S.*, A-1-CA-38614, mem. op. ¶ 26 (Ives, J., dissenting) ("This case presents an issue of profound importance not just for Mother and Child but for families throughout our state."). Because this Court is obligated to interpret statutes, *Consaul*, 2014-NMSC-030, ¶ 31, the right to parent is fundamental, *State ex rel. CYFD v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072, and the issue was raised as a matter of great public importance with an opportunity for the parties to be heard, our consideration of this issue is appropriate. Accordingly, we proceed to address New Mexico's neglect standard under Section 32A-4-2(G)(2).

**B.    New Mexico's Legal Standard for Neglect Under Section 32A-4-2-(G)(2)**

**{27}**    The parties request that we interpret Section 32A-4-2(G)(2) of the ANA which presents a question of law that we review de novo on appeal. *Shawna C.*, 2005-NMCA-066, ¶ 24 (citation omitted). "In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature." *Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545 (citation omitted). "[W]e look to the 'object the legislature sought to accomplish and the wrong it sought to remedy,'" *State v. Rowell*, 1995-NMSC-079, ¶ 8, 121 N.M. 111, 908 P.2d 1379 (citation omitted), examining first the language of the statute, though we "may also consider the history and background of the subject statute." *State ex rel. Klineline v. Blackhurst*, 1988-NMSC-015, ¶ 12, 106 N.M. 732, 749 P.2d 1111 (citation omitted).

**{28}**    With the Children's Code, which includes the ANA, the Legislature sought "first to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children's Code and then to preserve the unity of the family whenever possible." NMSA 1978, § 32A-1-3(A) (2009); *see also State ex rel. CYFD v. Raquel M.*, 2013-NMCA-061, ¶ 29, 303 P.3d 865 (quoting § 32A-1-3(A)). Taking these purposes into consideration, we recognize that "there is often a tension between the physical, mental and emotional welfare and needs of the child, . . . and the understanding that parental rights are among the most basic rights of our society and go to the very heart of our social structure." *State ex rel. CYFD v. Benjamin O.*, 2007-NMCA-070, ¶ 34, 141 N.M. 692, 160 P.3d 601 (internal quotation marks and citations omitted). *See Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (holding that parents have a constitutionally protected liberty interest in rearing their children). With the Legislature's objectives in mind, we consider the language of Section 32A-4-2(G)(2).

**{29}**    Section 32A-4-2(G)(2) provides that a neglected child is one

> who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them.

The plain language of the statute requires that two conditions be satisfied before a child meets the definition of a "neglected child." *Id.* The first addresses the circumstances and condition of the child, mandating that the child must be "without proper parental care and control . . . necessary for the child's well-being." *Id.* The second addresses the culpability of the parent, requiring that the child's lack of proper parental care and control must be "*because of* the faults or habits" of child's parent or the "failure or refusal" of child's parent to provide the necessary care or control. *Id.* (emphasis added). Absent proof of both of these elements by clear and convincing evidence, a child is not neglected.

**1. Proof required to show the child is "without proper parental care and control . . . necessary for the child's well-being"**

{30} Before a child is adjudicated neglected, CYFD must provide clear and convincing evidence that the child is without proper parental care and control, including but not limited to subsistence, education, and medical care. Section 32A-4-2(G)(2). CYFD must also show that the care and control that is lacking is necessary for the child's well-being. Section 32A-4-2(G)(2); *see State ex rel. Health & Soc. Servs. Dep't v. Natural Father*, 1979-NMCA-090, ¶¶ 9, 14, 93 N.M. 222, 598 P.2d 1182 (discussing the list as nonexclusive). The standard articulated by the Legislature, however, does not provide specific guidance to explain what amount of care and control a parent is required to provide to avoid an adjudication of neglect under the statute. Instead, the statute delineates only that proper care and control is that which is "necessary for the child's well-being." Section 32A-4-2(G)(2). This explanation, rather than answering our question, only leads us to another: What did the Legislature mean when it required that the care and control must be "necessary for the child's well-being?"

{31} "Our principal goal in interpreting statutes is to give effect to the Legislature's intent." *In re Mahdjid B.*, 2015-NMSC-003, ¶ 25, 342 P.3d 698 (internal quotation marks and citation omitted). "In interpreting statutory language, we look first to the plain language of the statute." *In re Guardianship of Patrick D.*, 2012-NMSC-017, ¶ 13, 280 P.3d 909 (text only) (citation omitted). However, "we look not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied." *Mahdjid B.*, 2015-NMSC-003, ¶ 25 (internal quotation marks and citation omitted). As we consider the Legislature's intent, "[w]e analyze a 'statute's function within a comprehensive legislative scheme.'" *Id.* (internal quotation marks and citation omitted).

{32} The Legislature did not define "necessary for the child's well-being." Section 32A-4-2(G)(2). We interpret the Legislature's broad language referring to "other care or control," as well as its requirement that the care and control be "necessary for the child's well-being" as its recognition that each child has differing needs and that the needs of one child may require care and control that is not needed or not appropriate for another. *Id.* By choosing these broad terms, the Legislature gave wide latitude to consider whether the needs of each child are being met, but this latitude makes it difficult to discern a standard by which parents are to be measured as courts consider whether children are neglected.

{33} As we begin our analysis, "we first turn to the plain meaning of the words at issue . . . using the dictionary for guidance," as we often do, *N.M. Att'y. Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 26, 309 P.3d 89 (citation omitted), "to ascertain [the word's] 'ordinary meaning.'" *State v. Nick R.*, 2009-NMSC-050, ¶ 18, 147 N.M. 182, 218 P.3d 868. "Necessary" means "absolutely needed: required." *Necessary*, Merriam-Webster Collegiate Dictionary (11th ed. 2005). Our analysis becomes more complicated when we consider the plain meaning of "well-being" as it is used in Section 32A-4-2(G)(2). "Well-being" is commonly defined as, "the state of being or doing well in life; happy, healthy, or prosperous condition; physical, psychological, or moral welfare." *Well-being*, Oxford English Dictionary (2nd ed. 1991). *See also*, *well-being*, Merriam-

Webster Collegiate Dictionary (11th ed. 2005) (defining well-being as "the state of being happy, healthy, or prosperous"). Taking these definitions into account along with the purpose of the statute, we do not believe the Legislature intended that every child who is not happy and prosperous must be adjudicated neglected. *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352 (explaining that "courts must exercise caution in applying the plain meaning rule," as a statute's "beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning [its] meaning"). We also see room for differing opinions as to what parental care or control is "necessary."

**{34}** Concluding that the plain language of Section 32A-4-2(G)(2) does not resolve what the Legislature intended when evaluating whether a child is neglected, we look to other provisions of the ANA in an effort to discern legislative intent. *See Mahdjid B.*, 2015-NMSC-003, ¶ 25. "The ANA, as part of the Children's Code, must be read as an entirety and each section interpreted so as to correlate as faultlessly as possible with all other sections." *Id.* ¶ 26 (text only) (citation omitted). The provisions of the Children's Code, including Section 32A-4-2(G)(2), "should be interpreted in such a manner as to effectuate its purposes, which include preservation of family unity when possible." *Id.* (internal quotation marks and citation omitted). Statutes must be considered "as a whole and in reference to statutes dealing with the same general subject matter." *In re Grace H.*, 2014-NMSC-034, ¶ 34, 335 P.3d 746 (internal quotation marks and citation omitted). "Whenever possible, we must read different legislative enactments as harmonious instead of as contradicting one another." *Mahdjid B.*, 2015-NMSC-003, ¶ 26 (internal quotation marks and citation omitted).

**{35}** We note that the Legislature has provided some guidance in other provisions of the ANA, explaining that we should interpret the Children's Code such that "[a] child's health and safety shall be the paramount concern," with the preservation of the family, whenever possible, coming next. Section 32A-1-3(A). The Legislature explained that the "[p]ermanent separation of a child from the child's family . . . would especially be considered when the child or another child of the parent has suffered permanent or severe injury or repeated abuse." *Id.* Considering the definition of "well-being" along with the guidance provided by the Legislature, we conclude that the Legislature intended that to find a child to be without proper parental care and control necessary for the child's well-being such that the child must be removed from the family, the child must be subjected to circumstances that create a serious risk to the child's mental or physical health and safety. A serious risk is one that is likely to result in important or dangerous consequences for the child. *See serious*, Merriam-Webster Collegiate Dictionary (11th ed. 2005) (defining "serious" as "having important or dangerous possible consequences"). This standard balances the Legislature's concern for the preservation of the family, when possible, while retaining as the paramount concern, the health and safety of the child. Courts must be cautious to avoid finding neglect in every lapse in parental care or control and must focus on those instances or circumstances likely to have a serious or significant impact on a child's health and safety. Evidence that supports only "a vague inference of future harm" does not rise to the level of neglect as defined in Section 32A-4-2(G)(2). *Shawna C.*, 2005-NMCA-066, ¶ 22.

**{36}** We note that Mother initially argued in her briefing that a finding of neglect "requires a showing of both actual harm and risk of potential future harm," and cannot be based on a risk of future neglect. Mother later acknowledged at oral argument before this Court that a risk of future harm is a proper consideration in a determination of neglect. Neither the plain language of Section 32A-4-2(G)(2) nor other statutes and case law support an actual harm requirement. Indeed, both our statutes and case law contemplate the consideration of the risk of harm to the child in the calculus of child neglect and indicate that a lack of parental care or control can take many forms, including a failure to properly supervise a child to keep the child out of harm's way. *See* § 32A-4-4.1(I)(2) (2019) (requiring CYFD at the initial stage of an investigation to assess the risk of imminent danger to the child and the risk of the "child becoming . . . a neglected child"); *Shawna C.*, 2005-NMCA-066, ¶ 15 (upholding child as neglected and at substantial risk of harm based on mother's prior neglect of her other children); *State ex rel. CYFD v. Cosme V.*, 2009-NMCA-094, ¶¶ 16, 21, 146 N.M. 809, 215 P.3d 747 (implicitly considering father's failure to protect children from a known risk of harm by upholding the district court's finding of neglect based on father's failure to protect children from "[in]adequate supervision and care, [and lack of a] safe and stable home environment"); *State ex rel. CYFD v. William M.*, 2007-NMCA-055, ¶ 62, 141 N.M. 765, 161 P.3d 262 (explaining that father neglected children by, among other things, failing to protect them from mother's neglect). Before finding neglect in such circumstances, however, courts must conclude that the risk of harm to the child is a serious risk that is likely to result in important or dangerous consequences for the child.

### 2. Whether the absence of proper parental care and control is *because of* the faults or habits of the parent

**{37}** Should the district court find that a child is "without proper parental care and control . . . necessary for the child's well-being," it must then determine whether the shortfall is "because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide them." Section 32A-4-2(G)(2). Again, the Legislature's language is sufficiently broad to take into account differing abilities of parents to provide resources necessary for the well-being of their children, noting that a parent's failure or refusal to provide resources must be "when [he or she] is able to do so" before a child is adjudicated neglected. *Id.* "[T]he focus [of this culpability element] should be on the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to [any] unfavorable status," *Shawna C.*, 2005-NMCA-066, ¶ 30, poverty being the most common. When considering a parent's ability to provide necessary care, any unfavorable status excusing parent's responsibility must be beyond his or her control and a parent's actions must be reasonable under the circumstances. *Id.* ¶ 28. This consideration of a parent's ability "operates to exclude cases in which even an exemplary parent could not provide 'proper parental care and control.'" *Id.* (citation omitted).

**{38}** Mother contends that when we consider the Legislature's intent in implementing Section 32A-4-2(G)(2), we must conclude that the Legislature intended that we presume that it is in a child's best interest to remain with the child's parent "unless the State provides clear and convincing evidence to support each specific element of Section

32A-4-2(G)(2)." We agree. It is not the court's role to determine whether a child would be better off in foster care than with the child's parent when considering whether a child is neglected. Instead, it is the court's obligation to consider whether a child's parent is providing those things absolutely needed for the child's well-being, and if not, whether it is the parent's acts or omissions, rather than poverty, or some other unfavorable status that are the cause of the parent's shortcomings.

### 3. Aggregation of multiple failures to provide proper care and control

{39}   Mother next claims that it was improper for the district court to aggregate the individual complaints against her in its determination of neglect because nothing in the plain meaning of the statute permits aggregation, and, standing alone, "none of the individual complaints considered at trial would have been sufficient . . . for a finding of neglect." We disagree with Mother's assessment of the plain meaning of the statute. The plain language of Section 32A-4-2(G)(2) specifies that multiple areas of parental care are "necessary for a child's well-being." Thus, the district court may consider multiple areas of parental care in determining whether a child is neglected. *See Natural Father*, 1979-NMCA-090, ¶¶ 9, 14 (noting the enumeration and explaining "'other care or control,' . . . is care and control other than subsistence, education and medical attention, but is care or control necessary for the child's well-being"). While the statute does not contain express language permitting aggregation, we read the enumeration of multiple areas of proper parental care and control in Section 32A-4-2(G)(2) as allowing the district court to consider together evidence bearing on different areas of proper parental care and control in its determination of neglect.

{40}   A parent may be at fault for failing to provide "proper parental care or control" in just one area or in multiple areas of parenting. One area of parental care—for example, financial support alone—may be so deficient that a child's well-being is negatively impacted to a level constituting neglect. *See, e.g., State ex rel. CYFD v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 31, 366 P.3d 282 (reasoning child was neglected based on father's failure to "provide financial support for Child or make other arrangements for Child's care or placement while Father was incarcerated"). Likewise, a single incident may form the basis for an adjudication of neglect. *See, e.g., State ex rel. CYFD v. Amanda M.*, 2006-NMCA-133, ¶ 31, 140 N.M. 578, 144 P.3d 137 (affirming determination that child was abused and neglected based on mother's failure to notice injuries to child and failure to seek immediate medical care on one occasion); *see also In re Victoria CC.*, 681 N.Y.S.2d 870, 933 (N.Y. App. Div. 1998) (determination of neglect based on leaving a nine-month-old child unattended in a bathtub). However, it may also be the case that, while one area of parental care is deficient, it is not so deficient so as to rise to the level of neglect under Section 32A-4-2(G)(2). *See, e.g., State ex rel. CYFD v. Michelle B.*, 2001-NMCA-071, ¶ 21, 130 N.M. 781, 32 P.3d 790 (reversing determination of neglect based on mother's failure to notice injury to child where there was no evidence that mother should have been alerted to injury, that child had been in danger, or any other evidence of neglect).

{41}   But, where there are multiple failures to provide proper parental care or control, which alone may have been insufficient to rise to the level of neglect, the combined

effect of these failures may be sufficient to constitute neglect under Section 32A-4-2(G)(2). In *Eventyr J.*, the Court of Appeals held that substantial evidence supported the district court's finding that mother

> emotionally abused and neglected her children *by the combined effect* of: (1) leaving them unattended for long periods of time, (2) exposing them to dangerous situations, (3) failing to understand their physical and emotional needs, (4) failing to empathize with their feelings, (5) being self-centered in her interactions with them, (6) exposing them to domestic violence, (7) exposing them to substance abuse, (8) showing an indifference to their needs in favor of her own, and (9) placing them with inappropriate caretakers.

1995-NMCA-087, ¶ 14 (emphasis added). The Court of Appeals properly considered several areas of proper parental care and control together to conclude that the child was neglected. Nonetheless, while multiple parental failures may be aggregated to support a finding of neglect, it remains CYFD's burden to prove by clear and convincing evidence that the combined effect left the child without proper parental care and control necessary for the child's well-being, and the child's neglect can be attributed to the fault or failure of the parent. *Shawna C.*, 2005-NMCA-066, ¶¶ 7, 28; *State ex rel. CYFD v. Amanda H.*, 2007-NMCA-029, ¶ 21, 141 N.M. 299, 154 P.3d 674.

**C.      Substantial Evidence of a Clear and Convincing Nature Does Not Support the District Court's Adjudication of Neglect**

**{42}**    Following two days of hearings, the district court adjudicated Child a neglected child, entering an order containing only sparse, conclusory, factual findings to support its holding, stating,

> [Mother] failed to protect the [C]hild from the violence and domestic abuse of [Jimmy], failed to meet [Child's] educational needs and ensure he attends school, failed to meet [Child's] medical needs and ensure he takes his medications, as required, and failed to maintain a safe and stable home for the [C]hild.

The district court did, however, provide an oral explanation of its ruling, discussing each of the factors it considered in its determination that Mother had neglected Child. Initially, the district court stated,

> I think it is clear by clear and convincing evidence that if you add everything together that there was neglect, that [Child] was neglected to a certain degree. Now was it a lot of neglect? Was it bad neglect? Did Mother do nothing to help him with his need for medication? No, I don't think that's true. I think mom did a good job in some ways, a very good job with a hard child to deal with.

. . . .

> So I am finding that all of that by clear and convincing evidence . . . that the child was a neglected child and that it is in the best interests of the child the State maintain custody for a period of up to two years. Hopefully it is not a period of any length at all to allow her to get some help, to resolve some of these issues. Any help the State can give [Mother] I would appreciate.

We discuss the district court's more specific explanation of its ruling below, as we address its rationale for adjudicating Child as neglected.

**1.      Standard of review**

**{43}**    To determine if substantial evidence of a clear and convincing nature supports the district court's factual findings regarding Mother's failures, we do not reweigh the evidence and "[w]e will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *Hector C.*, 2008-NMCA-079, ¶ 11 (internal quotation marks and citation omitted). "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Eventyr J.*, 1995-NMCA-087, ¶ 2 (internal quotation marks and citation omitted).

**{44}**    Then, considering those findings supported by substantial evidence of a clear and convincing nature, we review de novo whether those findings supported the district court's conclusion that Child is a neglected child as a matter of law under Section 32A-4-2(G)(2). *State ex rel. CYFD v. Lisa A.*, 2008-NMCA-087, ¶ 6, 144 N.M. 324, 187 P.3d 189 (stating that we review the district court's conclusions of law de novo).

**2.      The district court's finding that Mother failed to meet Child's medical needs is not supported by substantial evidence**

**{45}**    Finding Mother failed to meet Child's medical needs, the district court reasoned, "there is a conflict in the testimony about [Child's] medication and behaviors and when he was on meds and off meds but it looks like from the evidence I have heard [Mother's] explanation of [Child's] behaviors doesn't straighten out the problem. It is still concerning to me that there is chaos at home and that it needs to be resolved."

**{46}**    First, we note that whether parent has "straighten[ed] out the problem" is not the appropriate standard to evaluate whether a parent has neglected a child. The standard for neglect is not outcome determinative, but instead evaluates whether the parent has left the child without proper parental care and control necessary for a child's well-being. It does not ask whether a parent has fixed the problem, but instead requires the district court to consider whether a parent is taking sufficient and appropriate steps to address the problem. *See* Section 32A-4-2(G)(2). And if a parent is not taking sufficient and

appropriate steps, is it because of the faults and habits of the parent, or for a reason parent cannot control?

**{47}** Here, the district court heard testimony that Child was a very difficult child who had severe ADHD and had been in residential treatment at CTC, that he had behavior issues at school, which were more extreme after Child left CTC, that he was prescribed Ritalin and was sent home with a one-month supply, that Mother did not immediately refill his prescription upon discharge, that "it was obvious" to Child's principal that Child was not on his medication, and that there was at least a one- to two-dose lapse of Child taking his medication.

**{48}** There was also evidence that Mother had difficulty filling Child's prescription due to a delay with insurance, but that Mother had his medication at the time of removal and provided it to CYFD. The district court also heard Child had a difficult time with transitions and Mother sought treatment for Child's behavioral problems continuously beginning when he was a year old up until he was removed by CYFD, including Mother's efforts to secure wraparound services after Child was released from CTC before going into CYFD custody.

**{49}** This evidence does not establish by clear and convincing evidence that Child was without proper parental care and control necessary to address his medical needs. Indeed, the evidence establishes that Child suffered from severe behavioral health challenges, and Mother identified Child's behavioral issues in early childhood and consistently sought out support and treatment for Child up until the time CYFD took Child into custody. We recognize the district court heard conflicting evidence as to whether Child consistently received his medication during the two-month period he was with Mother from the time he was released from CTC until he was taken into custody by CYFD. Viewing this evidence in the light most favorable to the district court's judgment, as we must, we cannot say that under the circumstances of this case, a few missed doses of Child's ADHD medication during a two-month period, whatever the reason, demonstrates by clear and convincing evidence a serious risk that is likely to result in important or dangerous consequences for Child. It was because of Mother's efforts to obtain treatment for Child that Child was prescribed the medication, and the record indicates that she did refill the medication because she had it for CYFD at the FCM.

**{50}** We also question whether Child's ADHD medication can be considered absolutely necessary for his well-being in light of our Legislature's express prohibition against CYFD taking a child into custody "solely on the grounds that the child's parent . . . refuses to consent to the administration of psychotropic medication to the child." NMSA 1978, § 32A-4-6(B) (2015).[5] Ritalin is a psychotropic medication.[6] Because the

---

[5]Section 32A-4-6(B) was amended by Chapter 41, Section 48 of New Mexico Laws of 2022, 2nd Session, but the quoted provision was in effect at the relevant time and the amendment does not change this language.

[6]*See* Commonly Prescribed Psychotropic Medications Fact Sheet, https://www.nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/types-of-medication/methylphenidade-or-dexmethylphenidate-concentra-ritalin-and-others/ (last visited Sept. 26, 2024);

Legislature has clearly stated that a child cannot be taken into CYFD custody for a parent's refusal of treatment by psychotropic drugs, we cannot see how Child's missed doses of Ritalin, whether by Mother's failure or refusal, can form the basis of neglect of a child's medical needs.

{51}     To be sure, failure or refusal to treat a child's mental or emotional illness can be the basis for a finding of child neglect. *See In re C__F__B__*, 497 S.W.2d 831, 835 (Mo. Ct. App. 1973) (explaining the duty to provide medical care "extends to . . . treatment for mental and emotional ills"). However, here, considering Mother's diligent action in seeking treatment and medication for Child from the time he was a year old, the fact that Mother could likely have legally refused to give Child the medication altogether, and the evidence in the record indicating a few lapses in Child's medication, we conclude that substantial evidence of a clear and convincing nature did not support the district court's finding that Mother failed to exercise proper parental care and control over Child's medical needs. Mother did not subject Child to circumstances that created a serious risk to Child's physical or mental health and safety. Instead, the evidence indicates Child had challenging behavioral issues and Mother exercised appropriate care and control to address those issues by obtaining consistent and appropriate treatment for Child. With the exception of Child's missed medication, which we do not consider, *see* Section 32A-4-6(B), CYFD does not point to any failure or refusal on the part of Mother to obtain treatment for Child. Rather, CYFD relies solely on the claim that Child's behavior was better when he was in the care of CTC than when he was with Mother. While there are myriad reasons this might be the case, some of which have been discussed above, this is not the test set out by our Legislature—a test that balances the interests of the parent and the child and works to "preserve the unity of the family whenever possible." Section 32A-1-3(A). CYFD has failed to show that Child was medically neglected pursuant to Section 32A-4-2(G)(2).

### 3.     The district court's finding that Mother failed to protect Child from domestic violence was not supported by substantial evidence

{52}     As part of the "cumulative evidence" the district court considered in finding Mother neglected Child, the district court found that Mother failed to protect Child from the violence and domestic abuse of Jimmy. The district court expressed that the domestic violence issue was the most concerning among Mother's failures. The record indicates that the district court based its finding, in significant part, on Mother's failure to obtain a restraining order against Jimmy.

{53}     To be sure, the risk posed by a history of domestic violence combined with a failure to take any action to prevent future instances of domestic violence is serious and may constitute neglect under certain circumstances. *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 21, 132 N.M. 772, 55 P.3d 984 ("Evidence of past domestic violence can be relevant in an action for neglect when the abused parent fails to recognize the harm the violence causes the children or refuses to get help in ending the

https://www.jber.jb.mil/Portals/144/Services-Resources/Resiliency-Resources/PDF/SelfCareTipSheets/Common%20psychotropics.pdf (last visited Sept. 27, 2024).

situation."); *see also Eventyr J.*, 1995-NMCA-087, ¶¶ 22, 24 (reasoning that a parent exposing a child to violence combined with an unwillingness to take action to make the environment safer for the children is relevant to a parent's neglect and may constitute clear and convincing evidence of neglect); *State ex rel. CYFD v. Tammy S.*, 1999-NMCA-009, ¶ 18, 126 N.M. 664, 974 P.2d 158 (concluding that mother's failure to follow the treatment plan, along with her subsequent reunification with father "was sufficient evidence that [m]other was unable to protect the children from [f]ather's abuse or to properly provide for them"). To prove neglect resulting from domestic violence, CYFD must show that the domestic violence renders a parent unable to properly care for their children. *Amanda H.*, 2007-NMCA-029, ¶ 21 (providing that CYFD must prove "culpability through intentional or negligent disregard of [the c]hild's well-being and proper needs"); *see also* 43 C.J.S. Infants § 21 (May 2024 update) (providing "the focus is whether evidence of neglect of one child indicates a fundamental defect in the parent's understanding of the duties of parenthood").

{54}    We find the Court of Appeals' decision in *Ashleigh R.* instructive. In *Ashleigh R.* the Court of Appeals applied the neglect standard set out in Section 32A-4-2(G)(2) to determine whether a mother was unfit in a custody dispute between the mother and the grandparents of mother's two children. 2002-NMCA-103, ¶¶ 20-21. The Court of Appeals heard evidence of incidents of domestic violence between the mother and the children's father in their home, as well as evidence that the mother and her second husband "experienced domestic problems" requiring the mother to spend a week in a women's shelter. *Id.* ¶ 21. Acknowledging that domestic violence could support a finding of neglect "when the abused parent fails to recognize the harm the violence causes to the children or refuses to get help in ending the situation," the Court of Appeals concluded that the children were not neglected under the facts of that case. *Id.* ¶ 21. The *Ashleigh R.* Court explained that the domestic violence occurred four years prior to the hearing while parents were still married and living together. There was no evidence the children were present or witnessed these incidents. *Id.* Further, "there was no evidence of continuing abuse" in the relationship between the mother and her second husband. *Id.* The *Ashleigh R.* Court concluded that "the district court's finding that some incidents of domestic violence have occurred in [m]other's home does not support a finding that [m]other has been neglectful of her children." *Id.*

{55}    Here, the district court was presented with evidence of a single incident of domestic violence in Mother's home for which Child was not present. We acknowledge that Child's sisters were present during the September 2018 domestic violence incident, and evidence of abuse or neglect of other children can support a finding of neglect of a sibling. *See Shawna C.*, 2005-NMCA-066, ¶ 26 (acknowledging that harm to other children can be considered in finding neglect of another child). However, nothing in the record indicates that Child's sisters witnessed the domestic violence, or that they were physically abused by Jimmy.

{56}    As we evaluate Mother's interactions with Jimmy and whether her failure to obtain a restraining order showed a "fundamental defect" in her parenting, *see* 43 C.J.S. Infants § 21, we find two facts, in addition to those set out above, particularly relevant. First, CYFD acknowledged at the hearing that at no time did it put a safety plan in place

requiring Mother to refrain from contact with Jimmy or to seek services for domestic violence. And while CYFD was concerned that Mother did not file a restraining order following the September 2018 incident, the record reflects only that CYFD told Mother "it would probably be a good idea to get a restraining order, if she was going to get one," and CYFD's witness did not know if Mother was given any more information about how to get a restraining order. *See State ex rel. CYFD v. Joseph M.*, 2006-NMCA-029, ¶ 20, 139 N.M. 137, 130 P.3d 198 (deeming it "noteworthy that no treatment plans were ever formulated or implemented in this case" for the father to leave the mother, and the "[f]ather was never specifically and pointedly told that a failure to separate from [m]other could constitute a basis for terminating his rights as a parent because that relationship rendered him unable to properly care for his children"). We can only conclude from this information that CYFD did not consider this single instance of domestic violence a serious threat to the well-being of Child, and instead found it to be a vague inference of future harm. *Shawna C.*, 2005-NMCA-066, ¶ 22.

**{57}** While the CYFD investigator testified that she knew Mother had a history of domestic violence, it was "with other people," and the record is devoid of information about these events, including when these instances occurred, whether Child or his sisters were present for any of these other instances, and what steps Mother took to protect Child and his sisters from further violence. The CYFD investigator did make a statement that there was a "history of DVM [domestic violence]" between Mother and Jimmy, that Mother still had contact with Jimmy, and that she did not provide CYFD with Jimmy's contact information; however, there is nothing in the record indicating a history of domestic violence other than the September 2018 incident. Therefore, like in *Ashleigh R.*, CYFD's evidence of domestic violence did not support a finding that Mother failed to protect Child from the abuse and violence of Jimmy when the record shows that there was a single incident, Child was not present, and there was no evidence of any ongoing abuse.

**{58}** Our conclusion in no way is meant to excuse or minimize the traumatic and deleterious effects of domestic violence on children and families. In this case, however, CYFD has failed to show how this single instance, outside the presence of Child, that resulted in neither a safety plan nor a requirement for a restraining order from CYFD, rises to the level of clear and convincing evidence of neglect.

**4.     The district court's finding that Mother failed to maintain a safe and stable home is not supported by substantial evidence**

**{59}** The district court also found Mother failed to maintain a safe and stable home for Child. The district court explained that "this really is kind of a dirty home case," and found Mother failed in this respect because "[s]he was told she needed to clean it up, and a couple of months later it was worse." But the evidence did not support the district court's finding for two reasons. First, the district court's statements indicate that it misunderstood the facts presented, undermining the district court's factual findings. Second, CYFD did not connect the conditions of the home to the risk of harm to or well-being of Child, more than would support a mere speculation of harm. *Shawna C.*, 2005-

NMCA-066, ¶ 22 (providing that speculation of harm is insufficient to support a finding of neglect).

a.    **Inaccurate facts**

**{60}**    The record indicates that the district court misapprehended or failed to accurately recall the testimony related to alleged unsafe conditions in the home when it ordered the removal of Child. As explained above, the adjudication proceedings were broken up over two days with a three-month gap between the two hearings. The testimony presented focused on two separate instances when CYFD visited Mother's home—one in September 2018 and the second two months later in November 2018. During the second hearing, the district court judge summarized the testimony from the previous hearing, three months earlier. In doing so, he misstated that it was in September when CYFD first expressed safety concerns with the cleanliness of the home, including its concern that a steak knife had been left out where Child could reach it. He also stated that CYFD had safety concerns in September about the babysitters with whom mother left the children. While CYFD clarified that the children were left with the babysitters two months later, in November, CYFD did not correct the district court judge's other misunderstandings regarding the timing of CYFD's concerns about the condition of the home and the knife incident.

**{61}**    In fact, the district court judge heard testimony at the first hearing that, while CYFD initially thought the home was "a little messy," it was not concerned about the condition of the home in September. Rather, it was not until after CYFD's second visit in November that it expressed concern with the home. This factual mistake is significant because the district court, and ultimately the Court of Appeals, charged Mother with being on notice and failing to remedy the uncleanliness of her home for two months, when, in reality, CYFD had not expressed concern with the condition of the home until November, giving Mother only one day to address CYFD's cleanliness concerns. *See Heather S.*, A-1-CA-38614, mem. op. ¶ 17 (reasoning in part that substantial evidence supported the district court's determination of neglect because Mother was "warned" about the conditions in September and failed to act).

b.    **Risks of harm merely speculative**

**{62}**    At the adjudication hearings CYFD identified four conditions in Mother's home as presenting a danger to Child's well-being: the steak knife left on the kitchen table; an exposed electrical socket; the clothes, trash, and car parts scattered throughout the yard and home; and the overall dirty nature of the home.

**{63}**    With regard to the steak knife, Child and his siblings were asleep when CYFD found the knife on the kitchen table, and nothing in the record suggests Child had an opportunity to access it. And the testimony at trial did not indicate how long the socket had been without a plate, where this socket was, or whether it was accessible to Child, making it impossible to determine whether the risk of harm to Child was more than speculative. *See Shawna C.*, 2005-NMCA-066, ¶ 22.

**{64}** While the tire rim in Child's room, the piles of clothing, and the car parts in the front yard present some risk of harm—Child could trip on the car parts or clothing and it might be more difficult to get out of house in an emergency—these risks, alone, are not sufficient to require Child's removal. The regulations governing CYFD require that it "shall make reasonable efforts to maintain the family unit and prevent the removal of a child from their home, as long as the child's safety is assured." 8.10.3.16(A) NMAC. These conditions of the home here may have warranted some intervention by CYFD, *see* 8.10.6.9(A), (B) NMAC (explaining a family is eligible for in home services without regard to income, when the child is conditionally safe and the risk of harm is moderate or high, and even when the child is unsafe, but the risks of harm are low), but CYFD failed to explain how the risk rose to the level of a serious risk that is likely to result in important and dangerous consequences to Child rather than a mere speculation of harm. *Shawna C.*, 2005-NMCA-066, ¶ 22 (providing that speculation of harm is insufficient to support a finding of neglect). Indeed, the testimony at trial indicated that when CYFD returned to inspect the house the day after removing Child, there was still work to be done, but Mother had cleaned the living room and Child's room, suggesting that with the notice erroneously attributed to her by the district court after CYFD's September visit, Mother was prepared to remedy the concerns about the home expressed by CYFD.

**{65}** In sum, the condition of Mother's home may have warranted some intervention. *See* 8.10.6.9(A), (B) NMAC. However, substantial evidence does not support the district court's finding that Mother failed to maintain a safe and stable home such that it created a serious risk to Child's physical or mental health or safety. This is reinforced by the fact that Mother worked to resolve the issues with only one day's notice, getting the home "pretty clean." We cannot say that the risk of harm to Child was a serious risk that was likely to result in important or dangerous consequences. Instead the safety risks were merely speculative.

**5. The district court's finding that Mother failed to meet Child's educational needs is not supported by substantial evidence**

**{66}** The district court found "that there was some educational neglect" based on Child's absences and tardies, and that the amount of missed school was not acceptable, and negatively impacted Child. At trial, the district court heard testimony that Child was absent twelve days and tardy fifteen days during the first trimester. Of those absences and tardies, three absences and four tardies occurred during the forty-four days Child was at CTC, with the rest occurring while he was in Mother's care. Child's teacher testified that the absences affected Child academically and socially. Child's principal testified that when she spoke with Mother about Child's attendance, Mother explained that she and Child lived out-of-district and Mother had transportation issues she was trying to resolve.

**{67}** Child's absences and tardies while he was with Mother are concerning. However, we cannot conclude by clear and convincing evidence that the absences and tardies affected Child such that they created a serious risk to Child's mental or physical health or safety likely to result in important or dangerous consequences for Child. First, in

reaching its decision, the district court based its conclusion on the thirty-six school days from the time Child returned from CTC to the time CYFD removed him from Mother's home. CYFD has failed to explain why Child's poor attendance over this short period of time is likely to have such deleterious effects on Child and creates such a serious risk that removal, rather than other remedies, such as those available under the Attendance for Success Act, are appropriate. *See* NMSA 1978, §§ 22-12A-1 to -14 (2019) (requiring public schools to "provide interventions to students who are absent or chronically absent," including "services or goods that a student or the student's family needs to assist the student to stay in school and succeed," Section 22-12A-8(E)(8)).

**{68}** The district court also relied on the testimony of Child's teacher that Child's absences and tardies impacted him academically and socially. Child's teacher, however, did not explain how those absences and tardies, over the short period of time involved, created a serious risk to Child's mental or physical health. While we do not doubt that the absences affected Child, we have no evidence to suggest Child could not recover from these impacts or that they would have important or dangerous consequences for him. Further, the evidence presented to the district court indicated that, notwithstanding Child's tardies and absences, Mother was engaged with Child's educational needs. She promptly came to the school on the occasions when Child had a behavioral outburst and each time expressed her concern with Child's behavior. When she was not able to get him to school on time, she would walk him to the office to check him in and then walk him to class. Absent clear and convincing evidence of a serious risk to Child, which is not present here, removal and foster care should not be CYFD's first course of action and Child cannot be adjudicated neglected.

**{69}** Even if we were to conclude that sufficient evidence existed to find that Mother failed to provide proper parental care and control over Child's education, CYFD did not present clear and convincing evidence to show that Mother's failure to satisfy Child's educational needs was Mother's fault and not due to circumstances beyond her control. *See Amanda H.*, 2007-NMCA-029, ¶ 22 (explaining "the burden [is] on CYFD to establish that Child was neglected by clear and convincing evidence"); *Shawna C.*, 2005-NMCA-066, ¶ 28 (explaining the fault requirement is not satisfied when a child is without "proper parental care and control due to circumstances beyond that parent's control or where a parent is acting reasonably"); *see also* Jacqueline D. Stanley, J.D., 32 Am. Jur. 3d *Proof of Facts* § 6 cmt (September 2024 update) ("It is inappropriate for a court to find that parents have neglected their children in the face of evidence that the parents are using the resources at their disposal and making reasonable efforts to provide for the needs of their children."). The only evidence presented to explain Child's absences and tardies came from Child's principal. Child's principal testified that Mother and Child lived out-of-district and Mother explained that she had transportation issues she was trying to resolve. CYFD did not present evidence that Mother was disinterested or disengaged from Child's education, or that she refused to bring him to school. Instead, the evidence indicated that she walked him to class when he was tardy and was always responsive when she was contacted by the school. The evidence presented to the district court does not "instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that" Child's absences and tardies were due to the faults and failures of

Mother. *See Eventyr J.*, 1995-NMCA-087, ¶ 2 (internal quotation marks and citation omitted).

{70} While the district court did not discuss the effect that poverty had on Mother and her ability to provide proper care and control necessary for Child's well-being, the record makes clear that in this instance, Mother was impacted by poverty. CYFD investigators testified about children's tattered shoes and dirty clothes and Mother and Child's principal both explained that Mother lacked reliable transportation. *See State v. Chavez*, 2009-NMSC-035, ¶ 35, 146 N.M. 434, 211 P.3d 891 (citation omitted) (relying on what was apparent from record to conclude that certain environmental "conditions evidence[d] poverty"). In *Chavez*, Justice Bosson, addressing a charge of child endangerment, explained that these are cases "where the family struggled with poverty, and our ultimate goal should be to assist, rather than to punish, that status." *Id.* ¶ 43. This is equally true in instances of alleged abuse and neglect. "[P]overty . . . [does not] equate to neglect." *Shawna C.*, 2005-NMCA-066, ¶ 30. "[T]he Act does not permit a court to find abuse or neglect based solely on a parent's status." *Id.* Instead, CYFD must show "that [m]other's status renders her unable to care for [c]hild." *Id.* Here, CYFD failed to make such a showing.

## III.    CONCLUSION

{71} For the foregoing reasons, we reverse the Court of Appeals and remand to the district court to vacate the adjudication of neglect and dismiss the petition.

{72}    IT IS SO ORDERED.

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JOSHUA A. ALLISON, Judge**
**Sitting by designation**